IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

ROBERT EARL RAY, JR.,
     Plaintiff,

2007 OCT -3 A 10: 25

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Vs.

* CASE NO:2:07- CV-721-WKW
          (wo)

TROY KING-ATTORNEY GENERAL,
et al.,
     Defendants,           *

---

## OBJECTIONS TO THE MAGISTRATES RECOMMENDATION

## AND AMENDED FACTS TO THE COMPLAINT

    Comes now Robert Earl Ray, Jr., (hereinafter "Ray") in the above style cause and moves this honorable court to amend the following facts to the complaint and consider the objections. Thereafter granting him redress of his claims and serve the defendants, Troy King-Attorney General; Richard Allen- ADOC Commissioner; Billy Mitchem, Warden (hereinafter "Troy King")

that they may be ordered, to respond to the allegations contained herein.

## JURISDICTION

Pursuant to §1343(a), the district courts have original jurisdiction of any civil action authorized by law to be commenced by any person. To redress the deprivations, under color of any state law, statue, ordinance, regulation, custom or usage, of any right privilege or immunity secured by the constitution of the United States or by any act of congress providing for equal rights of citizens or of all persons under the jurisdiction of the United States. 28 U.S.C. §1331 gives federal courts jurisdiction over all 'federal questions' cases involving the federal constitution or laws. A federal statue, 28 U.S.C. §1391 (b), states that a 1983 case can be brought in a district "where all the defendants reside" or where the claim arose.

## QUALIFIED IMMUNITY

The defendants cannot shield themselves with the defense of qualified immunity because Ray is not seeking any money damages only injunctive relief.

## FACTS OF THE CASE

On January 10, 2006, Ray was taken into custody by transfer agents from Tensas Louisiana, and was placed in the West Carroll Detention Center on contract with Alabama. The sole purpose of the transfer was to 'relieve the prison overcrowding' which acerbates all other ills of the prison system amounting to cruel and unusual punishment by the ADOC in violation of the eighth amendment of the United States Constitution. On August 10, 2007 Ray filed a TRO/Preliminary injunction asking this court to grant him the (TRO) by federal intervention, ordering a United States Marshall to take him into custody and place him in a federal facility where he will not be re-subjected to the same or worse overcrowded and unconstitutional living conditions within the ADOC prisons. Ray alleged that it would be in violation of his eighth and fourteenth amendment rights to re-subject him to the same or worse conditions "after having been taken out of them", because the Defendants have not corrected their overcrowding or unconstitutional living conditions. Ray pointed out that the defendants have been under orders for 36 years to correct the overcrowding and unconstitutional living conditions and they have failed to comply with orders from the courts. Ray allegded that if this court allowed the defendants under the color of state law to re-subject to an 'irreparable injury' one which is ongoing and uncorrected, the very reason that he was entitled to both a

3

TRO/Preliminary injunction. The TRO was requested, because 'he could not wait on the court to decide the constitutionality of his claim in the preliminary injunction. Sometimes it takes months even years for the courts to decide such issues. The TRO served the purpose to protect Ray from being re-subjected to the same or worse living conditions in which he was taken out. The TRO injunction would stop the defendants from doing something that cannot be undone. The TRO injunction would protect Ray from "actual or imminent injury". This means that Ray did not want to be re-subjected back to the dangerous and unconstitutional living conditions in which was forced upon him prior to his transfer to the state of Louisiana or that if the feral courts did not intervene that he would be harmed if allowed to be taken back into those conditions. The TRO order is the only thing that will protect Ray from suffering some sort of harm that cannot be repaired later. The TRO/Prelimanry injunction will stop the defendants from doing something that cannot be undone. This is called an 'irreparable injury'. Ray showed that if the TRO/Preliminary injunction is not granted he would face immediate and irreparable injury. There would be little or no adverse impact upon the defendants and that the TRO/ preliminary injunction would serve the public interest by relieving the overcrowding and it would grant Ray his right to be free from cruel and unusual punishment and the likelihood is that Ray will

4

win this case. Griffin V. Box, 1956 F. 2d 89,92 (5th cir. 1992); Duke v. Clelard, 954 F 2d 1526,1529 (11th Cir. 1992).On August 15, 2007 this court denied the request for a TRO and Ray was later re-subjected to the overcrowded and unconstitutional living conditions within the ADOC. On August 24, 2007, Ray filed a motion into this court for 'medical emergency treatment' if this court allowed him to be re-subjected to the overcrowded and unconstitutional living conditions within the ADOC. The medical treatment request was specific in nature and stated that the medical treatment was necessary and that due to the overcrowding in the ADOC his medical needs have been either neglected or simply ignored, resulting in deliberate indifference. A Doctor had made a diagnosis that Ray needed surgery on his teeth and that he did suffer serious, chronic back pain, (deteriated disk disease) which treatment was ordered and not treated as ordered. This court denied such medical request. On August 27, 2007, Ray was transferred back to the state of Alabama and placed within the ADOC, specifically the Limestone Correctional facility. On September 07, 2007, the honorable Wallace Capel, Jr., United States magistrate judge granted Ray in forma pauperis and ordered him to pay 20 percent of any money received until he pays the amount of the filing fee. The court then made a recommendation to dismiss Ray's complaint with prejudiced prior to service of

process upon application of the directives set forth in 28 U.S.C. §1915(e)(2)(B)(i) as being frivolous or malicious.

Ray now presents his objections to the magistrates report.

The Magistrate stated: "a convicted prisoner has no constitutionally protected right to confinement in a particular penal facility. Thus, generally prison officials may transfer a prisoner for whatever reason or for no reason at all. Consequently, an inmate may be confined in any correctional facility without implicating the prisoners' rights. Although Ray's confinement in a correctional facility operated by the Alabama Department of corrections may entail /more burdensome conditions' than that of the West Carroll Detention Center and/or federal facility, such confinement is within the normal limits or range of custody which the conviction has authorized the state to impose. Consequently, the failure to imprison Ray in a federal correctional facility within the State of Alabama does not implicate the due process protection of the constitution and such claim is, therefore, due to be dismissed."(Frivolous and malicious).

1. Ray objects to the way that the magistrate judge has misconstrued his complaint and issues for review. Whether Ray was placed in a certain facility is not the issue for review. The

issue is that Ray has the constitutionally protected right not to be subjected to "imminent and irreparable injury" by being re-subjected to the ADOC facilities, which have been deemed overcrowded and living conditions unconstitutional. Campbell V. Beto, 460 F. 2d 765 (5th Cir. 1972); Newman V. Alabama, 349 F. Supp. 278 (MD. Ala. 1972) and Pugh V. Locke, 406 F. Supp. 318 (MD. Ala. 1976). Ray raised that if he is allowed to be re-subjected to the ADOC custody and placed within their prison facilities that his constitutional rights would immediately be violated and causing him "actual injury". Federal courts have shown that they will not hesitate to intervene when action is clearly necessary to protect prisoners constitutional rights. Campbell v. Beto, id.

Injury does not have to mean physical damage to your body. It just means that you are, or will be, worse off because of the illegal acts of the prison. See Lewis V. Casey, 518 U.S. 343 (1996). The defendants placing Ray back into the same or worse overcrowded and unconstitutional living conditions is more than burdensome it is in violation of the eighth amendment amounting to cruel and unusual punishment.

Ray agrees that he has no constitutional right to be confined in a particular prison facility. He does have the right not to be placed into a knowingly overcrowded and unconstitutional living conditions within any facility, rather it is in Louisiana or Alabama. Ray sought this intervention from the federal government and requested that he be placed within one of their facilities in Alabama. Ray agrees that his confinement is within the normal limits or range of custody, which the conviction has authorized the state to impose. Ray does not challenge whether the state of Alabama has jurisdiction over him. The issue is that the failure of this court not granting him the TRO/preliminary injunction has triggered an 8th amendment violation, because Ray's rights are in jeopardy when the ADOC were allowed to place him back into the same or worse conditions. Ray requesting that a united states Marshall take him into custody and place him in a federal facility is only a requested means of intervention to prohibit the ADOC placing Ray in the ADOC facilities. Ray stated it would be easier for this court to make an order taking Ray into federal custody than to make an order for the ADOC to fix their overcrowding and unconstitutional living conditions. This is the sole purpose of the TRO.

2. Ray objects and avers that this honorable court abused its discretion when it denied him the TRO wherein the facts and law

warranted federal intervention because Ray's constitutional rights were in jeopardy or about to be in jeopardy and waiting for a preliminary injunction hearing will cause him 'immediate and irreparable injury', loss and damage. TRO civil procedure rule 65(b), federal courts will intervene to protect Ray's constitutional rights. See, Campbell v. Beto, 460 F. 2d 765 (5th Cir. 1972). The United states court of Appeals for the fifth circuit, Gates V. Collier, 501 F. 2d 1291 (1974) citing Robinson v. California, 370 U.S. 660, 82 S. Ct. 1417, 8 L Ed. 2d 758 (1962.) Stated: "Our decisions have recognized the right of prisoners to seek judicial review of their conditions of confinement and have provided relief from unconscionable methods of incarceration," see e.g., Hutchens v. State Of Alabama, 466 F. 2d 507 (5th Cir. 1972). One of these reliefs's is a TRO in emergencies. Ray presented a list of reasons for the TRO and even showed that he would be injured by being subjected to an ongoing overcrowded prison conditions wherein he would be subjected to unconstitutional living conditions. Ray will present the unconstitutional living conditions later to show what he has been subjected to due to this court failing to grant him the TRO, even when he presented grounds for relief.

3. Ray objects to the magistrate stating: "that his assertions that he would be subjected to unconstitutional living conditions were at the time speculative."

Ray points this court to (Exhibit "1") a newspaper article from the 'Huntsville times, Sunday, July 15, 2007:

QUOTE: RICHARD ALLEN: "As recently reported, the inmate numbers at over 29,021 are *at an all time high*, and we are currently housing about 1,300 inmates in leased space in Louisiana."

QUOTE: RICHARD ALLEN: " A survey we concluded last year identified over *$90 million in code up upgrades, maintenance and capital improvements (not including new construction) that must be done to get our facilities back in decent and safe condition.* While we could not spend $90 million in a year or two even if we had it, the money generated by selling some of our unproductive assets can be used to *begin a program to rehabilitate some of our facilities.* We plan to spend, for example, $1.0 million at Tutwiler to make it *at least somewhat more habitable, and, if possible, we will reduce the population from 700 down to 650 to* ease crowding. We hope to spend about $18 million system-wide, including the normal funds set aside for every day maintenance and repairs, to make a dent in our backlog-it will take years to complete all necessary maintenance and repairs"

SEE (Exhibit "2") a newspaper article from 'the Huntsville times, Friday, July 13, 2007':


QUOTE: RICHARD ALLEN: "Those funds will be used to make a dent in the $90 million worth of repairs and renovations that are needed to bring the system up to code."


QUOTE: RICHARD ALLEN: "Donaldson prison in Bessermer will receive $3.3 million for renovations including its roof, doors, locks and security hardware. The Tutwiler women's prison in Wetumpka will have more than $1 million worth of work done, and the Staton prison in Elmore will have a $2.4 million kitchen installed and its health care unit will be expanded."


See (Exhibit "3") a newspaper article from the "Huntsville times, Friday, August 17,2007:

QUOTE: DEPUTY PRISONS CHIEF VERNON BARNETT: "The understaffed and overcrowded corrections Department wants to use a hoped-for $23.8 million from the planned sale of nearly 6,000 acres to start chipping away at $90 million worth of capital improvements."


See (Exhibit "4") a newspaper article from the "Huntsville Times, Monday, May 14, 2007"

QUOTE: Desiree Hunter, The associated press: "The number of inmates squeezed into Alabama's overcrowded prisons back near the states all-time high 28,440 just six months after the end of a second parole board. The state prisons were built to handle fewer than half of the 28,338 inmates who were behind bars in March. Corrections officials say the numbers will likely get worse before they get better, with no plans to reinstate the second board."

QUOTE: BRIAN CORBETT, Alabama Dept. of corrections spokesman: said in a recent interview, "It's something we knew was going to happen."

QUOTE: "A sentencing commission report predicted there would be 32,106 TO 33,415 inmates in Alabama prisons in September 2007."

See (Exhibit "5") a newspaper article from "Huntsville Times by staff writer David Holden:

QUOTE: "The Limestone Correctional facility near Capshaw will have 3000 more prisoners by the end of September; Alabama prisons commissioner Richard Allen said Thursday. The inmates are among about 1,300 the department of corrections is bring back from Louisiana by the end of November; Allen told the Times editorial board. Prisons are still *overcrowded* and short-staffed, and

buildings are deteriorating because of lack of maintenance, Allen said "I had a study done last year that indicated that we had $90 million in deferred maintenance in our facilities." Limestone houses about 2,300 inmates. The 300 inmates from Louisiana will be placed in a vacant warehouse converted to medium-security housing."

The above exhibits 1-5 consisting of Newspaper articles clearly shows that the Alabama Prison system is:

1. That the system is overcrowded.

2. The prisons are below standard code for habitation.

3. The prisons are deteriorating and needs $90 million in maintenance and repairs for human habitation.

4. That the present dilapidated state prisons were built to handle fewer than half of the 28,338 inmates who were behind bars in March. The inmates are squeezed into the system.

5. The defendants in their official capacities knew this would occur according to Brian Corbett and Richard Allen.

6. They have no plans to fix the systems overcrowding.

7. They are spending money to fix the prisons to be habitably than to build more prisons to house the squeezed in inmates.

8. Richard Allen stated in the Huntsville Times (Exhibit "5") that the inmates returning from the state of Louisiana would be

placed in a vacant warehouse converted to medium-security housing. This did not occur. Instead, we (Ray) was squeezed into the dormitories already existing while that warehouse is unoccupied.

9. The prison is understaffed and in stress.

3. Ray objects that his complaint is frivolous or malicious in nature. Frivolous means "of little weight or importance, no rational basis or argument based upon the evidence or law in support of his claim." Malicious being defined as 'wrongful and done intentionally without just cause or excuse or as a result of ill will." Ray's legal right to seek a TRO/Preliminary injunction to prohibit an action, which causes 'irreparable injury' is not considered frivolous or malicious. A claim should be dismissed as baseless only "when the facts alleged rise to the level of the irrational or its wholly incredible...an in forma pauperis complaint may not be dismissed, however, simply because the court finds the plaintiffs allegations unlikely. Denton V. Hernandez,_____U.S. _____, 112 S Ct. 1728, 1733-34, 118 L. Ed 2d 340 )1992); Gartrell V. Gaylor, 981 F. 2d 254, 259 (5th Cir. 1993). The dismissal of a complaint as frivolous or malicious can and will be appealed. Flowers V. Turbine Support Div., 507 F. 2d 1242, 1244 (5th Cir. 1975). The court having weighed the facts in making its decision to dismiss the complaint is abuse of

discretion. Denton V. Hernandez, 112 S. Ct. at 1733 also Neitzke

V. Williams, 490 U.S. 319, 319, 109 S. Ct. 1827, 104 L. Ed. 2d

338 (1989) (even if the complaint fails to state a claim under

federal rules of civil procedure 12 (B) (6), the court has held

that the complaint may nonetheless have an arguable basis in the

law and thus not be frivolous under §1915(d) and its predecessor

to §1915(e)(2)).

In any §1983 action, the initial inquiry must focus on whether

the two-essential elements to a §1983 action are present:

1. Whether the person engaged in the conduct complained of was

acting under color of state law. (2) Whether the alleged conduct

deprived a person of rights guaranteed under the constitution or

law of the United States, 354 U.S. 521, 77 S. Ct. 1371, 1 L. Ed

2d 1529 (1957) (absent some evident improper motive, the

appellant establishes good faith by presenting any issue that is

not plainly frivolous or malicious.)

These two essential-elements have been established and Ray has

enumerated a laundry listing of unconstitutional conditions in

which he would be subjected to if the TROI/preliminary injunction

were not granted. Ray has never filed a previous civil suit,

which has been deemed as frivolous and malicious and dismissed

with prejudice. Ray is not acting in an improper motive. He is

exercising his right to have redress of deprivations of his

constitutional rights. Citing Dace V. Solem, 858 F. 2d 385 (8th

Cir. 1988) (complaint is not frivolous where it alleges that defendants failure to properly staff, train and supervise). The issue raised by Ray in his compliant deserves redress.

4. Ray objects to the magistrate judge recommending that Ray file a new civil action challenging the conditions of his present confinement in the U.S. District court for the district in which the facility which houses him is located. Ray objects and avers that at the time in which his complaint was filed he was located at the West Carroll Detention center in the state of Louisiana. Ray did file within the proper jurisdiction, the Middle district of Alabama. For this court to ask Ray to re-file his complaint would cause him much prejudice to his right to have his issues redressed by this court.

1. This court is the proper court of jurisdiction when this complaint was commenced.

2. This court has the proper jurisdictional authority to address the issues under §1391 says that a §1983 case can be brought in a district "where all the defendants reside". The defendants reside in the Middle District of Alabama.

3. That Ray is suffering "actual injury" physically and emotionally.

4. His life is in imminent danger due to the gross overcrowding, which acerbates all other ills, such as understaffing, lack of security.

5. Ray does not have the money to pay another court filing fee.

6. If this court wishes that his claim be redressed by another court then this court can transfer this case to another court for its redress.

7. It would be burdensome to Ray for this court to order him to restart his litigation process. He is in dire need of federal intervention.

8. Whether it be the middle, northern or southern district courts, every district would be appropriate venue under 28 U.S.C. §1391 (b)(2) because all prisons in the ADOC give rise to the claims occurring.


5. Ray objects to the courts refusal to serve the defendants and request that they will be served. Federal Rule of civil procedure 41(j) requires that all the defendants be served with the complaint within 120 days. Hamilton V. Endell, 981 F 2d 1062, 1065 (9th cir. 1990).

The dispositive question is whether Ray was entitled to a TRO/preliminary injunction preventing him from suffering irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. Exhibitors Poster Exchange V. National Screen Service Corp., 441 F. 2d 560,561-62 (5th Cir. 1971). University Of Texas V. Camenisch, 451 U.S. 390, 395 (1981); Cate V. Oldham, 707 F. 2d 1176, 1185 (11th Cir. 1983); Fernandez-Roque V. Smith, 671 F 2d 426, 429 (11th Cir. 1982).

Another dispositive question is whether Ray will suffer irreparable harm if the preliminary injunction is not granted. The Eleventh Circuit has stated that irreparable harm or injury is "'the sine qua non of injunctive relief.'" See, e.g., Siegel V. Lepore, 234 F 3d 1163, 1176 (11th Cir. 2000) (quoting Northeastern Fla. Chapter of the Ass'n of Gen. Contractors V. City of Jacksonville, 896 F 2d 1283, 1285 (11th Cir. 1990).Without a finding of a likelihood of irreparable injury, preliminary injunctive relief is improper and will be reversed on appeal. In order to qualify as irreparable, harm or injury must be 'actual and imminent." Id. In determining whether harm alleged and the delay of the movant in seeking relief.

Since the 1970's the Alabama prison system has been grossly overcrowded and the legislature will not fund adequate space or facilities for inmates who are imprisoned against their will. In Deshaney V. Winnebago County Dep't of soc. Servs., 489 U.S. 189,

109 S. Ct. 998, 103 L. 103 Ed. 2d 249 (1989), the supreme court

summarized a state's constitutional responsibilities:

[W]hen the state takes a person into its custody and holds him there against his will, the constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being....The rational for this principle is simple enough: When the state by the affirmative exercise of its power so retrains an individuals liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the eighth amendment and the due process clause.

Deshaney, 489 U.S. at 199-200 (citations omitted).

Overcrowding is a penal institution is cruel and unusual

punishment and is punishment without due process of law. Costello

V. Wainwright, 525 F. 2d 1239 (5th Cir. 1976), Vacated and

remanded 539 F. 2d 547, Rev'd and remanded 430 U.S. 325 (1977);

Mitchell V. Untreiner, 421 F. Supp. 886 (N.D. Fla. 1976); McCray

V. Sullivan, 399 F. Supp. 217 (S.D. Ala. 19785), Aff'd in part,

rev'd in part and remanded, 509 F. 2d 1332, Cert. denied 423 U.S.

859. Overcrowding has no reasonable relationship to legitimate

institutional goals, Pugh V. Alabama, 46 U.S.L.W. 2799 (1978).

The eighth amendment prohibition against cruel and unusual

punishment "is not limited to specific acts directed at selected

individuals, but is equally pertinent to general conditions of

confinement that may prevail at a prison." Gates V. Collier, 501

F. 2d 1291, 1301 (5th Cir. 1974).

19

As stated earlier the inmates who returned from the state of Louisiana were not placed in the vacant warehouse as stated in the Huntsville Times. Instead, we were integrated into the same overcrowding dormitories with all other inmates. Ray is going to present to this court the conditions of the Limestone correctional facility and this court decide whether Ray is entitled to a TRO/preliminary injunction as requested. Citing All Care Nursing Service, Inc. V. Bethesda Memorial Hospital, Inc., 887 F. 2d 1535,1537 (11th Cir. 1989). (A preliminary injunction is issued only when "drastic relief" is necessary). Do the conditions at the Limestone Correctional facility deserve federal intervention?

1. As stated in Exhibit "4" -"*The state prisons were built to handle fewer than half of the 28,338 inmates who were behind bars.*" Therefore, the system is housing twice its capacity statewide. The Limestone correctional facility is by far the best prison that Alabama has to offer when it comes to the overcrowded and unconstitutional living conditions. It nevertheless, falls way below the standard of modern decency for human habitation. Do I believe that the Warden of the Limestone Correctional facility Billy Mitchem is trying to keep his facility within his proper control? Yes I do. This does not fix the overcrowded prison nor does it provide adequate safety for the inmates within it confinements. This facility is in violation of state health laws,

fire codes, occupancy laws, and statutory requirements regarding the adequate housing and maintenance of convicted prisoners in the state of Alabama as stated by Richard Allen, prison commissioner (exhibits "1-5"). This prison was originally designed to house 812 inmates. It now houses over 2,300 inmates. Three times, it designed capacity. The facility was designed to place two inmates per cell with there being 76 cells per dormitory, totaling 152 inmates per dormitory. The facility as designed in 1984 consisted of dorms 7,8,9,10,11,12. This facility has been expanded over the years by adding dormitories 6,14,15,16. The dormitories have changed from number sequence to letter sequence. 6-dorm is now B-dorm. 7-dorm is now C-dorm. 8-dorm is now D-dorm. 9-dorm is now E-dorm. 10-dorm is now I-dorm. 11-dorm is now J-dorm. 12-dorm is now K-dorm. 14-dorm is now L-dorm. 15-dorm is now G-dorm and 16-dorm is now H-dorm. B & C dormitories are strictly for special Unit (HIV) inmates. Dormitory G is strictly for court ordered SAP and Crime Bill program inmates. Half of dormitory D-78 and H dorm are faith based honor dorms. E dorm is for segregation and safe keeping inmates. Dormitories D-77; J; K; L and I are considered population inmates. Each dormitory named above, D-77; J; K; L and I now houses over 284 inmates per dormitory, which is excessive for inmates to live, over 132. Where the dorms were designed to house 750 inmates, it now houses 1,420 inmates. Beds have been

21

placed in the day rooms of each dormitory at a rate of 66 beds totaling 132 inmates. The courts have ruled that placing beds in the day room of a dormitory is considered to be unconstitutional ( ). The court ruled in Williams V. McKeithen, 121 F. supp. 2d 943 (2000) "*The state may exceed the capacity of residential dorms by two float beds on a temporary basis up to four days. They will not increase the capacity of a residential dormitory, even on a temporary* basis." Limestone placed the beds in the dormitory day room back in 1996 and they remain. This is an ongoing situation and it has not been done with the intent of being temporary. Albro v. County of Onondaga, 627 F. Supp. 1280, 1287 (N.D. N.Y. 1986)(preliminary injunction granted due to "continuous overcrowding.") The 132 inmates placed in the day room area in each dormitory are forced to utilize four bathrooms for waste purposes, shaving, ect. 132 inmates divided by the four bath rooms we have 33 inmates per bathroom. When the two men cells utilized their own bathroom within their cells. All 284 inmates per dormitory are forced to utilize 16 showers. Due to the overcrowding the bathroom and shower areas are unsanitary. The DOC do not provide each inmate with sterile chemicals after each inmate uses the sink or toilet and this creates temper flares, staff infections and other rashes.

The massive use of the bathrooms and showers are chaotic and uncontrollable. There is a constant smell of sewer within the dormitory bathrooms, which flows through the open bay areas of the dorm. Inmates are forced to sleep only three feet from the bathroom areas. The inmates smoke in the dormitories, although it is unacceptable and against state law and prison regulations, due to the understaffing of officers the rule is not enforced. The effects of severe overcrowding are heightened by the dormitory living arrangements (406 F. supp. 323), which prevail in this institution. Bunks are packed together so closely that there is no walking space between them. As stated in (exhibit "4) *inmates are squeezed into Alabama's overcrowded prisons."* The bed arrangements in the dormitories create hostility between inmates and a constant disrespect, which cannot be, avoided. One inmate bends over into another inmates face trying to get into his box located under his bed area. This also creates a security risk and hazard for inmates where we are threaten constantly for doing such disrespectful acts, unintentionally. There is no need to inform the ADOC they are understaffed and cannot change the bed arrangements due to the overcrowding. The dormitory living conditions are so unconstitutional that it is emotionally and physically harmful and it genders violence, which cannot continue to be ignored. As cited in <u>Touissaint v. young</u>, 722 F. 2d 1490,1492 (9th Cir. 1986) *"overcrowding and understaffing are*

recognized causes of increase violence among prisoners." Common sense tells you that if you stuff more people into an area than it was designed to hold and if you fail to assign enough guards to watch over them, you are going to get more incidents of violence. Morgan V. Dist. Of Columbia, 824 F. 2d 1049,1061 (D.C. 1987). "Inadequate staffing found to lead to inadequate control over the materials used to manufacture weapons".) Citing Tillery V. Owens, 719 F. Supp. 1256,1276 (W.D. Pa. 1989) aff'd 907 F 2d 418 (3rd cir. 1990). This institution and every institution in which Ray has resided is full of deadly weapons. ("**A complaint is not frivolous** where it alleges that defendants failure to properly staff, train and supervise") citing Dace V. Solem, 858 F. 2d 385 (8th Cir. 1988). As stated by Deputy Prison chief Vernon Barnett in (exhibit "3")-"The **understaffed** and overcrowded corrections Department." It is obvious that the system is overcrowded and understaffed as has been in this condition well over thirty consistent years. An ongoing problem unattended by the state of Alabama. The neglect and deliberate indifference needs to be addressed by this court. Under the eighth amendment to the constitution, prison officials cannot simply turn a blind eye and deaf ear to the two problems, which creates gross violence and a risk of death among prisoners. Ray is now suffering an "irreparable injury" because the ADOC, defendants have failed to hire and train adequate staffing and decrease the

overcrowded population by building new prisons or releasing inmates. The constitution does not permit prison officials to "wash their hands" of any responsibility for the violence that results when prisoners are thrown together carelessly without any thought to the threat they might pose to each other. Morgan V. Dist. Of Columbia, 824 F. 2d 1049,1057 (D.C. Cir. 1987). Prison officials cannot be deliberately indifferent to an inmate's safety. The officials cannot simply let the violence happen if they could prevent the violence by taking reasonable measures. Deshaney V. Winnebago County Dept. Of Social Services, 489 U.S. 189,200(1989). Richard Allen, Troy King and other could prevent the understaffing but they refuse to correct the ongoing problem. Should Ray and the rest of the 29,000 inmates continue to suffer the irreparable injury because the state of Alabama refuses to address the ongoing thirty-year problem? The constitution says, NO. Potential for future harm from inmate violence in an overcrowded prison constitutes "irreparable injury" supporting request by potential inmate for preliminary injunction to reduce population violating 8th, 14th amendments of the U.S.C.A. On August 24, 2007, the warden of the Limestone correctional facility ordered that 427 inmates to be housed in H dorm (a warehouse converted to house inmates). [1]

[1]. 250 honor dorm inmates were already in H dorm. The other 240 inmates in D dorm half was moved to H dorm to house the incoming inmates from Louisiana.

Those inmates are being forced to live in the horrific overcrowding conditions and are threatened with disciplinary action or placed in house arrest if they try to move out of the dormitory due to the overcrowding conditions. Dorm H is not suitable for housing prison inmates and certainly not 428 inmates in a room 100 X 160 feet, with one cold drinking fountain, insufficient ice available with only 13 toilets (2 inoperable), 22 Lavatories (7 inoperable), 10 urinals (2 inoperable),, and 20 showers consisting of 5 poles with 4 showerheads on each pole (5 inoperable).[2] Dormitory H has inadequate ventilation and no working exhaust fans in the bathroom/shower area. The conditions that exist create great danger to inmates and officers because there are only tow officers assigned to 428 inmates. Dorm H was limited to 250 inmates years ago as part of a settlement related to the chain gang and that was supposed to be temporary. Since that time, inmates with HIV were taken from H dorm due to the oppressive heat and inadequate ventilation, resulting in the highest HIV death rate for prisoner in the nation. This warehouse is not suitable for permanent housing for inmates. The building is not up to code nor authorized by law to house human beings.

The back wall of the dorm is separated and the roof shakes from the vibration of the fans. A fire Marshall recently informed the prison that they could not house that many inmates in that dormitory. The prison is overcrowded and understaffed. Ray has shown that he is suffering an ongoing "irreparable injury". There is not a single prison that ray can live within the ADOC which is not suffering more or the same conditions. Ray is not seeking any monetary damages. He is seeking injunctive relief. Ray is suffering a ongoing medical condition which has not been treated due to the lack of medical staffing and lack of treatment. Ray brought this to this courts attention.

## RELIEF REQUESTED

That this court will either place Ray into federal custody, until Alabama corrects their ongoing overcrowding and understaffed prisons. Alternatively, order the warden of the Limestone correctional facility to bring his population to the amount in which he has proper staffing. Remove all the beds from the day room areas. Order that no more beds will be placed within the institution. That no more than two beds be placed within the cells of the institution in which it was designed. That Ray will not be forced to live in any other institution, which is in the same or like conditions after addressing these conditions at this facility.

## CONCLUSION

An injunction is a court order to do or not to do something. Ray is entitled to relief and respectfully request that relief. Done on this the __30th__ day of September 2007.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the magistrate judge in care of the court clerk. A copy of the foregoing has not been served upon the defendants and Ray ask that this court will issue the complaint to the defendants. Done on this the __30th__ day of Septemebr 2007.

ROBERT EARL RAY, JR.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

ROBERT EARL RAY, Jr.,

     Petitioner,    2007 OCT -3 A 10: 25

Vs.    DEBRA P. HACKETT, C. 07 -CV-721-WKW (WO)
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

TROY KING et. al.,

     Respondent.    *

STATE OF ALABAMA    :

LIMESTONE COUNTY    :

### A F F I D A V I T

The undersigned authority did appear Patrick J. Charest, AIS# 182262 whom did state under the penalty of perjury the foregoing attestations, as follows:

§ 1. I am of the legal age, nineteen years or older, and of sound mind, being competent to testify, additionally do state that I have first hand personal knowledge of the following facts concerning the immense overcrowding.

a. Limestone Correctional Facility, the institution at present where I currently reside was built in 1984 and originally designed for approximately 874 inmates, but however to date houses in upper numbers of 2300, and currently under inner construction to add at least another 200 -300 inmates to its already exacerbated infrastructure.

Although being imprisoned at multiple other penal systems, over the past thirteen (13) years throughout the State of Alabama, Limestone remains the least invasive at present to me in contrast to others, albeit relatively as damaging to my: emotionally, physically, and mentally well being -which remains the proximate causes of undue,

needless stress, fear, harm -injuries inclusive to other medical problems to which I suffer, and treated for, at present, such as "acute blood pressure, irregular bouts of severe outbreaks of skin problems, sores, bleeding rashes, hair loss, nasal -throat problems induced by the second hand smoke, chronic headaches due to the extreme temperatures, inadequate air ventilation, and the tremendous noise associated with the massive overcrowding from morning wake up to lock down."

b.    The dormitory styled living conditions only accommodate an area of less than 12 -18 square feet per inmate, if that. General housing in the dormitory, commonly referred to as the *parking lot,* holds anywhere from between 128 -135 inmates[1] sharing only 8 toilets / sinks and at times less than that primarily due to already burdensome problems for maintenance, repairs. The accommodations for showering are just as intrusive, if not worse, due to inadequate -unconstitutional styled living conditions forced upon me to survive, or otherwise maintain my basic human needs. Raw sewage often permeates from the lower tier shower drains flowing into the *parking lot* (i.e., dayroom, bedroom and common areas due to overtaxing infrastructure.

c.    Generally only three Correction Officers are assigned to a[ny] given dormitory unit, on a[ny] given shift, and at present, at least two or more of the assigned officials are only cadets in training, and not statutorily classified as Department of Correction Officers (hereinafter "DOC") {thus leaving us 128 -291 inmates to be supervised by only one trained DOC official} especially, specifically during the three (3) chow calls, on first shift {between 10:15am

---

[1]    *Excluding the additional 78 cells in some of the dormitories -housing an additional 156 inmates.*

2

to about 12:30pm), then again on second shift (between 3:15pm to about 6:30pm), then once again for breakfast, on third shift (between 2:30am to about 5:30am). Thus creating an insurmountable dangerous environment for me to fend for myself.

d. Smoking, although not allowed is often more than not an ongoing drastic problem within the dormitory, bathrooms, and especially, specifically in the T.V. area whereas I suffer inhaling second hand smoke, if I speak to those violating I'm told to simply leave "there area" whereas DOC cannot supervise due to the lack of inadequate staffing.

e. Smoking area's were created this summer to off set the violations of those smoking inside the dormitories; but the cages are seldom used –but for a few whom obey rules, for the most part from breakfast until 10:30pm lockdown the dormitory stays *noisy, smoky* and constitutionally *understaffed*.

f. The DOC Classification, Healthcare are just as inadequate –due to the exacerbated overcrowding, understaffing and properly trained specialist to numerable to list, the record proper through the media releases speak for themselves herein under Rule 201(b)(2), Ala.R.Evid.

Affiant sayeth nothing further.

Done so this September 27th, 2007.

Respectfully submitted,

Patrick Joseph Charest
AIS# 182262 * J-Dorm
Limestone Correctional
28779 Nick Davis Road
Harvest, Alabama 35749

3

NOTARY PUBLIC

[.S E A L]

NOTARY PUBLIC AT LARGE, ALA.     AFFIANT PATRICK J. CHAREST

9-8-2010

MY COMMISSION EXPIRES

Sworn to and subscribed heretofore this _____ day of
_____, 2007.

4



The Huntsville Times, Sunday, July 15



'INDEPENDENCE-WISE, WE *STILL* HAVE A FEW KINKS TO WORK OUT.'

# Getting prisons under control

## Alabama inmates in Louisiana may soon return to the state

**By RICHARD F. ALLEN**
*For The Times*

Shortly after I was appointed Alabama Department of Corrections commissioner in February 2006, a reporter asked if I would be able to improve the Department's financial situation. I responded, somewhat naively it now appears, that if I could clearly articulate the department's needs, support would be forthcoming.

Some early developments gave us cause to be optimistic – the governor's release of conditional appropriations in the 2006 and 2007 budgets enabled us to clear the county jail backlog, but beyond that no help is on the horizon from the Legislature.

In our 2008 budget request, we asked for funds to continue operations at the current tempo, plus enough for the pay raise set out in the Governor's Plan 2010, to help

courts to implement the voluntary sentencing guidelines; we have pushed Community Correction Programs and we have pleaded with the parole board to move more inmates faster and to create a Technical Violator Center to divert parole failures. We are now partnering with Chief Justice Sue Bell Cobb to push these programs, and we welcome her new initiative to establish a drug court in every county.

If we are to live within the resources made available by the state, we must do two simple things – reduce our expenditures and increase the revenues we generate from our own internal operations. Clausewitz once said, "Everything in war is simple, but even the simplest thing is difficult."

The same is true of operating a Department of Corrections – our success will depend on how well we implement this two-prong strategy. We will lower costs by canceling the contracts for housing inmates in Louisiana, and we will increase our revenues by generating more from the work release program. Our plan is to accomplish six "sim-

gram has been on the statute books since 1976 but has been dormant for years. This program gives the department the authority to send certain inmates near their end-of-sentence date either home or to a halfway house for the purpose of them finding a place to live, finding employment, or pursuing educational opportunities – all while still under the supervision of the Department of Corrections.

Rehabilitation, resocialization, and reintegration are the Program's primary goals. It allows offenders to re-enter society with a much higher level of supervision and, consequently, with a greater chance of success than those inmates on parole or those released at end-of-sentence with no supervision.

A collateral benefit of the governor's guidance is that certain unproductive assets can be sold and the money generated used to begin paying down our maintenance debt. A survey we conducted last year identified over $90 million in code upgrades, maintenance and capital improvements (not including new construction) that must be done to get our facilities back in de-

*e Times*

shortly after I ... Alabama Dep... Corrections commenced in February 2006, a reporter if I would be able to improve partment's financial situa- responded, somewhat naive- w appears, that if I could articulate the department's support would be forthcom-

e early developments gave e to be optimistic – the gov- release of conditional ap- tions in the 2006 and 2007 s enabled us to clear the jail backlog, but beyond that is on the horizon from the ...ure.

r 2008 budget request, we r funds to continue opera- the current tempo, plus for the pay raise set out in ernor's Plan 2010, to help ...nd retain our over stressed staff, and for a "down pay- n the massive $95 million maintenance backlog.

...e smoke cleared in the ...process, gone was the pay I the maintenance fund. s of the lack of general lars.

e ability to pay for our con- ...urrent level of operations ...ingent upon us raising at ...) million by selling land, ...nt, and other assets.

ly June, the governor di- ... to find a way to balance ...ating budget without using ... money. e specified that ... raised by land sales could ...sed to upgrade our deteri- ...acilities. My staff and I de- ... new strategy to meet that ... that will enable us to op- ... have funds to begin to re- facilities.

...ently reported, the inmate ... at over 29,021 are at an ...ugh, and we are currently ...about 1,300 inmates in ...ace in Louisiana. Inmate ...n growth depends on two ...nput and output. As long ...te's prosecutors, judges, ...arole board put more ... in than go out because of ...ntence or parole, the ... we account for and house ...).

...ve urged the DA's and

Center to divert ...with Chief Justice Sue Bell ...to push these programs, and we welcome her new initiative to establish a drug court in every county.

If we are to live within the re- sources made available by the state, we must do two simple things – re- duce our expenditures and increase the revenues we generate from our own internal operations. Clause- witz once said, "Everything in war is simple, but even the simplest thing is difficult."

The same is true of operating a Department of Corrections – our success will depend on how well we implement this two-prong strategy. We will lower costs by canceling the contracts for housing inmates in Louisiana, and we will increase our revenues by generating more from the work release program. Our plan is to accomplish six "sim- ple" tasks in the next four or five months:

■ Bring all 1300 male and fe- male inmates, now in Louisiana, back to Alabama by October/No- vember 2007.

■ Accelerate the transfer of in- mates to the work release program – from about 1,800 to 3,300 by Oc- tober/November 2007.

■ Convert the Montgomery Pre- Release Center to a women's facili- ty.

■ Open the Limestone Pre-Re- lease Center and the new Thera- peutic Education Center.

■ Implement a Supervised Re- Entry Program pursuant to Alaba- ma Code Section 14-8-60.

■ Make some other relatively small budget cuts and implement some minor revenue improve- ments.

Implementing this simple plan, while continuing to insure public safety, will be difficult. It will mean moving thousands of prisoners in addition to the 1,500 to 1,800 we normally move in and out every month. It will mean reviewing thousands of records and selecting eligible inmates for work release and the re-entry program. It will mean diverting already scarce secu- rity staff to supervise inmates on the Supervised Re-Entry Program. But, if we can do all of this, the pay- off will be worth it.

The Supervised Re-Entry Pro-

halfway house for the purpose of ...continuing a place to live, finding employment, or pursuing educa- tional opportunities – all while still under the supervision of the De- partment of Corrections.

Rehabilitation, resocialization, and reintegration are the Program's primary goals. It allows offenders to re-enter society with a much higher level of supervision and, consequently, with a greater chance of success than those inmates on parole or those released at end-of- sentence with no supervision.

A collateral benefit of the gover- nor's guidance is that certain un- productive assets can be sold and the money generated used to begin paying down our maintenance debt. A survey we conducted last year identified over $90 million in code upgrades, maintenance and capital improvements (not includ- ing new construction) that must be done to get our facilities back in de- cent and safe condition.

While we cannot spend $90 million in a year or two even if we had it, the money generated by sell- ing some of our unproductive as- sets can be used to begin a program to rehabilitate some of our facilities. We plan to spend, for example, $10 million at Tutwiler to make it at least somewhat more habitable, and, if possible, we will reduce the population from 700 down to 650 to ease crowding.

We hope to spend about $18 million system-wide, including the normal funds set aside for every day maintenance and repairs, to make a dent in our backlog – it will take years to complete all necessary maintenance and repairs.

It is said that the Chinese charac- ter for "crisis" is made up of two other characters; one being danger, and the other opportunity. There is, of course, always the danger that we will not be able to do in such a short period of time the things we need to do and that we will fail in the attempt. But this is a great op- portunity to do some things for the Department that have been left un- done for many years. We will im- prove the system, enhance public safety and fix long-standing prob- lems with our infrastructure.

*Richard F. Allen is Alabama's commissioner of corrections.*

B6  The Huntsville Times, Friday, July 13, 2007

# Critics say prison land sale short-term solution

## Money to be used for improvements at state's lockups

**By DESIREE HUNTER**
The Associated Press

MONTGOMERY – When corrections officials said earlier this year that state property would be sold to plug a $30 million hole in its operating budget, the plan was quickly denounced by those who said property should not be sold for recurring annual costs.

When Gov. Bob Riley and Prisons Commissioner Richard Allen announced Wednesday that money from selling 5,763 acres will instead go toward overdue capital improvements, not operational costs, the change still didn't sit well with critics, who said it is shortsighted and should be re-evaluated.

"Here's the problem," University of Alabama criminal justice professor Bob Sigler said Thursday. "Selling the land is a one-time solution to a long-term problem.

"The governor's intention is to move property from the Department of Corrections to private use – it doesn't make sense," he said.

The department has about 21,000 acres total and hopes the sale, which includes the Farquhar State Cattle Ranch in Greensboro, will generate $16.3 million to $23.8 million.

Those funds will be used to make a dent in the $90 million worth of repairs and renovations that are needed to bring the system up to code.

Allen, reached Thursday while visiting editorial boards across the state, said he views the sale as a "blessing in disguise" despite the plans unpopularity.

"We initially felt that we needed to sell the land in order

to balance our budget, and we found other ways," he said. "But then (Riley) also said we could sell some of it to meet some of our capital improvement needs. ... We didn't have any way of finding them until this came up."

Rep. Ralph Howard, D-Greensboro, said he was "extremely frustrated" that Hale County – one of the poorest in the state – will suffer an economic hit with the loss of the cattle ranch.

"They buy the catfish food here, the cattle feed here, the medicine for the cattle – all that stuff is purchased locally," he said. "They spend a lot of money in this community."

Corrections officials say its farming operations are a financial drain. But according to its 2006 annual report, total farming revenue statewide that year was $2.4 million with catfish bringing in $389,877 and

cattle accounting for $11 million.

But Allen said those numbers don't tell the full story because operating costs aren't listed. When those are accounted for, he said, its not economically justified.

"We've got a $10 million asset bringing in $150,000 a year," he said. "That's why it doesn't make sense for us to keep those on."

Donaldson prison in Bessemer will receive $3.3 million for renovations including its roof, doors, locks and security hardware. The Tutwiler women's prison in Wetumpka will have more than $1 million worth of work done, and the Staton prison in Elmore will have a $2.4 million kitchen installed and its health care unit will be

## Prisoner

Continued from page B1

prison farms and charging the Alabama Department of Transportation $10 a day for road workers.

Prisons are still overcrowded and short-staffed, and buildings are deteriorating because of lack of maintenance, Allen said. "I had a study done last year that indicated that we had $90 million in deferred maintenance in our facilities."

Limestone houses about 2,300 inmates. The 300 in-

mates from Louisiana placed in a vacant war[...] converted to medium-s[...] housing.

More than 900 of [...] mates returning [...] Louisiana are men. Ab[...] are women. Allen s[...] Kilby Correctional Faci[...] Montgomery will be co[...] to a women's prison.

Some of the men wil[...] work-release centers, [...] mates will be placed in [...] apetic education cent[...] others will go into a st[...] community re-entry p[...] supervised by the pris[...] tem, Allen said.

The Huntsville Times, Friday, August 17, 2007

# State prison system will overhaul vocational division

## Money-losing ventures, such as farming, will close

**By DESIRE HUNTER**
*The Associated Press*

MONTGOMERY – Alabama's Department of Corrections is getting out of the box business.

The same goes for data entry, farming and paint and having inmates service the department's fleet.

All this because Prisons Commissioner Richard Allen said it's time for Alabama Correctional Industries, or ACI, to start thinking out of the box, too.

It's the largest restructuring of the corrections subdivision, which generated and spent about $19.1 million in fiscal 2006. It has generated and spent about $16.5 million so far this year, prisons officials said. Allen said income from the

### At a glance

These are the Alabama Correctional Industries prison locations:

**St. Clair:** Vehicle Restoration; Chemical Manufacture; Furniture Restoration; Mattress; Fleet Services; Modular Furniture

**Bibb:** Furniture Plant

**Elmore:** Remodeling; Institutional Construction

**Draper:** Furniture Plant; Fleet Services

**Tutwiler:** Data Entry; Clothing

**Kilby:** Printing Plant; Vinyl Bindery

**Ventress:** Boxes; Chairs

**Easterling:** Paint

**Holman:** Tag Plant; Metal Fabrication

**Fountain:** Fleet Services

*The Associated Press*

division's few profitable ventures is being used to keep failing ones afloat, so ACI has been losing money for years.

"I want ACI to be a profit center, not just a way to keep people occupied and keep people busy," he said in a recent interview. "The challenge was how to make it profitable so it would throw off income to the department, which we can then use to help offset the cost of incarceration."

ACI was formalized with the "Prison-made Goods Act" passed in 1976, but ACI Director Andy Farquhar said the state dabbled in manufacturing long before then, with inmates spinning cotton in the 1920s.

According to the 1976 act, part of the subdivision's mission is to "provide meaningful work and vocational training programs for inmates," but that will change with the restructuring scheduled in the coming months.

"It's going to be profitable –

that's the new No. 1," said Farquhar, who has overseen the division since 1985.

He and Allen stressed that the restructuring is still in proposal status and is being reviewed by various staffers and departments. Allen said he expects the new ACI division to be operational before this time next year.

"There are more than two dozen ACI entities, including 11 manufacturing operations, four service enterprises, five farms, three-fleet maintenance facilities and a central warehouse and distribution facility. Manufactured products include furniture, mattresses, chemicals and uniforms.

Inmates who work for ACI are paid 25 cents to 65 cents per hour, and the division operates out of a revolving account, meaning that it doesn't get direct appropriations from the

state General Fund and that it survives using revenue from its goods and services.

Allen said ACI's car tag, printing and clothing manufacturing operations have been extremely profitable, but he said that hasn't been the case at its farms, where cattle and catfish have been raised and crops such as cherry tomatoes, peas, squash and corn have been harvested.

The profitable operations will be expanded, but the farming operations will be shut down, he said.

"We will not be doing any more commercial-type operations where we're trying to grow things to sell in the open market," Allen said. "We've got some crops in the field right now, but this will be the last year that we'll do that."

Deputy prisons chief Vernon Barnett said opponents of the

plan need not worry about enfranchised ACI inmates treating back to prison to die their thumbs. "Wha want to do is train these them a good wage," he sa for high-skilled jobs that

The understaffed and crowded Corrections De ment wants to use a prope $23.8 million from the pla sale of nearly 6,000 acres t chipping away at $90 m worth of capital improven

Allen and Gov. Bob Ri nounced a far-reaching p eliminate most of a $20 m hole in the agency's open budget for fiscal 2008 by within the system, raising n ting costs and raising r within the system. Critics chided corrections office selling state property for a time gain instead of inv money necessary to ... money-losing operations itable.

# to prisons

## New sentencing guidelines aim to make dent, but not soon

**By DESIREE HUNTER**
*The Associated Press*

MONTGOMERY – The number of inmates squeezed into Alabama's overcrowded prisons is back near the state's all-time high of 28,440 just six months after the end of a second parole board that helped release inmates faster and created more prison space.

The state's prisons were built to handle fewer than half of the 28,338 inmates who were behind bars in March. Corrections officials say the numbers will likely get worse before they get better, with no plans to reinstate the second board and a yearslong lag until new sentencing guidelines make a substantial dent.

March is the most recent month for which complete inmate population numbers are available.

"Overall the population is rising again, which is consistent with the projections prior to just before the second parole board was put into place," Alabama Department of Corrections spokesman Brian Corbett said in a recent interview. "It's something we knew was going to happen."



**Prison Commissioner Richard Allen is trying to deal with a growing prison population.**

But officials, including the Alabama Sentencing Commission's Rosa Davis, say things could be a lot worse and would have been if not for the work done by the second board.

The prison population was lowered to 26,600 during the three years of the second board, which began in 2003. It was dissolved on Sept. 30 after state legislators failed to pass a bill that would have extended it for another three years.

A 2003 sentencing commission report predicted there would be 32,106 to 33,415 inmates in Alabama prisons in September 2007.

"We need to look at what it would have been if no changes had been made at all," Davis said. "That's an important part. If you look at these reports, then you have a differential of possibly 5,000 inmates that DOC is not responsible for today."

Opponents of renewing the second board said it wasn't needed anymore because the number of eligible parole cases had dwindled low enough for one board to handle.

Robert Oakes, a Pardons and Paroles division director, said judges have been issuing more split sentences where inmates serve a portion of their sentence in prison and the rest on probation. Only sen-

---

| der, B2 | Obituaries, B3 | Business, B6 | **B1** |

*The Huntsville Times* | *Monday, May 14, 2007*

# Crowding problem returns to prisons

## New sentencing guidelines aim to make dent, but not soon

**By DESIREE HUNTER**
*The Associated Press*

MONTGOMERY – The number of inmates squeezed into Alabama's overcrowded prisons is back near the state's all-time high of 28,440 just six months after the end of a second parole board that helped release inmates faster and created more prison space.

The state's prisons were built to handle fewer than half of the 28,338 inmates who were behind bars in March. Corrections officials say the numbers will likely get worse before they get better, with no plans to reinstate the second board and a yearslong lag until new sentencing guidelines make a substantial dent.

March is the most recent month for which complete inmate population numbers are available.

"Overall the population is rising again, which is consistent with the projections prior to just before the second parole board was put into place," Alabama Department of Corrections spokesman Brian Corbett said in a recent interview. "It's something we knew was going to happen."



**Prison Commissioner Richard Allen is trying to deal with a growing**

But officials, including the Alabama Sentencing Commission's Rosa Davis, say things could be a lot worse and would have been if not for the work done by the sec-

# Prisoner shuffle set to save millions

## Limestone to get 300 of 1,300 returning to state from Louisiana

**By DAVID HOLDEN**
*Times Staff Writer*
*david.holden@htimes.com*

The Limestone Correctional Facility near Capshaw will have 300 more prisoners by the end of September, Alabama prisons Commissioner Richard Allen said Thursday.

The inmates are among about 1,300 the Department of Corrections is bringing back from Louisiana by the end of November, Allen told *The Times'* editorial board.

Housing prisoners in Louisiana costs more than $12.4 million a year. He said moving those inmates from Louisiana is expected to save Alabama's prison system about $9.9 million.



**Richard Allen, state prisons chief, says bringing home inmates in Louisiana will save $9.9 million a year.**

Gov. Bob Riley and state prison officials announced plans Wednesday to raise $16 million to $23 million for capital improvements by selling 5,763 acres of department property, moving prisoners and making prison industries turn a profit.

The plan also calls for eliminating

*Please see* **PRISONER** *on* **B6**

## Prison land sale criticized

■ Opponents of the prison land sale say that property should not be sold for recurring annual costs. **B6**

# Impoverished prisons?



NEWS COURIER/KIM RYNDr

A group of Limestone Correctional Facility inmates listen to a speaker in a Substance Abuse Program intake session Thursday. Prison Commissioner Richard Allen said 119 more inmates are coming into th system than leaving every month. He said the increase is drug-offense driven.

# State DOC officials tell lawmakers prison system needs more funding

By KAREN MIDDLETON
karen@athensnews-courier.com

It takes $375 million a year to incarcerate 28,000 state prison inmates, and still that's not enough.

Meanwhile, the Department of Corrections is proposing to build a new women's 1,600-bed prison

sometime in the 2008-2009 time-frame, according Prison Commissioner Richard Allen.

In a prison population increase driven by drug offenses, an average of 119 new inmates are coming into the system every month. "It's a relentless situation," Allen said

Thursday.

Allen headed a panel of prison officials who were invited to Limestone Correctional Facility by District 25 Rep. Mac McCutcheon. R-Huntsville, to ex-

See Prison, page 2A





NEWS COURIER/KIM RYNDERS

Limestone Correctional Facility Warden Billy Mitchem stands in the "parking lot" of a 240-inmate dorm Thursday. Mitchem explained to a group of touring legislators and journalists that inmates relegated to sleeping in a common room with its lack of privacy are usually those who have lost the right to the more private quarters of a cell because of disciplinary infractions. — This is a lie. Every inmate begins there stay in the dayroom area and over time he is moved into a cell, after another inmate is transferred. The day room beds are not for disciplinary action. These beds have been here since 1996. The prison is overcrowded, Robert Rs.



*other individuals. Paid obituaries may in-clude a photo at no extra charge. For infor-*

Mrs. Coots died Wednesday, Feb. 7, 2007, at Athens Convalescent Center.

# PRISON

*Continued from 1A*

plain system needs to local legislators leading into state budget hearings.

Allen said the Department of Corrections is particularly under-funded for capital improve-ments and personnel. A prison the size of Limestone Correctional Facility—the largest both physically and by population of the 14 higher- and medium-security facilities in the state—needs 72 more correctional officers than allocated.

Currently, the 1,200-acre Limestone prison houses 2,115 inmates in a facility designed for 1,628.

By mid-summer Limestone is scheduled to increase its capacity by 300 to 500 with the con-version of a former onsite-industrial ware-house to a dorm. Lt. Richard Frazier said it would take about $250,000 to convert the warehouse because the heating and cooling system has to be replaced.

Allen emphasized that if judges and district attorneys would employ new sentencing guide-lines, "prison growth should level off or drop."

"From 200 to 300 a month could be direct-ed to community-correction programs," he said. "Thirty-eight counties now have commu-nity corrections.

Allen said if the pardon and paroles office had a "technical violations center" in which parolees failing urine drug screenings or those who miss appointments could be held, another 80 a month would be held out from returning to prison.

"We need help from the Legislature on pay differentials," said Allen. The state raised trooper salaries and Allen said that is attracting officers away from the prison system. "A 10-percent pay raise could make the system more competitive."

Allen said when Gov. Bob Riley appointed him as commissioner in February 2006, "near-ly every facet of the prison system was broke." He said the four major problems are: over-crowding; aging facilities—with the oldest, Draper, built in 1939; health-care costs that have gone from $44 million to $80 million in the last three years; and personnel shortage. Alabama has an inmate-to-officer ratio of 10-to-1. Surrounding states have a 6-1 ratio.

After the meeting, DOC spokesman Brian Corbett said the new women's prison is one of the proposals that the system will make in its presentation to the Legislature. "No site has been selected," he said.

# GUILTY